# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Quantronix, Inc., a Utah corporation,

Civil No. 07-1799 (DWF/AJB)

Plaintiff,

v.

**AMENDED MEMORANDUM OPINION AND ORDER**

Data Trak Technologies, Inc.,
a Minnesota corporation; Data Trak
Solutions NA, Inc., a Minnesota
corporation; Wildwood Technology, LLC,
a Minnesota Limited Liability Company;
Robert Tessier, an individual; and Michael
Everson, an individual;

Defendants.

_____

Devan V. Padmanabhan, Esq., and Paul J. Robbennolt, Esq., Dorsey & Whitney LLP;
H. Dickson Burton, Esq., Edgar R. Cataxinos, Esq., J. Jeffrey Gunn, Esq., and
Krista Weber Powell, Esq., TraskBritt, PC, counsel for Plaintiff.

Kathryn K. Smith, Esq., and Michael S. Sherrill, Esq., Sherrill Law Office; Mark E.
Duea, Esq., and Timothy R. Geck, Esq., Geck & Duea, counsel for Defendants.

_____

The Court files this Amended Memorandum Opinion and Order in order to make

clarifications in its Memorandum Opinion and Order dated August 1, 2007. Specifically,

in this Order, the Court has made amendments, including adding footnotes, to paragraph

1.a of the Order and has added subparagraphs 1.a.i, ii, iii, iv, and v. The amendments and

additions can be found on pages 17, 18 and 19 of this Order. In all other respects, this

Order is identical to the August 1, 2007 Order.

## INTRODUCTION

The above-entitled matter came before the Court pursuant to Plaintiff Quantronix, Inc.'s ("Quantronix") Motion for Preliminary Injunction and Request for Evidentiary Hearing[1] and Defendant Data Trak Technologies, Inc., Data Trak Solutions NA, Inc., Wildwood Technology, LLC, Robert Tessier, Michael Everson, and Troy Buchholz's (collectively "Data Trak") Motion for a Stay of Litigation on the '464 Patent Pending Completion of Reexamination of the '464 Patent.  In its Complaint, Quantronix asserts the following counts against Data Trak:  (1) patent infringement of United States Patent No. 5,042,015 (the "'015 patent"); (2) patent infringement of United States Patent No. 5,105,392 (the "'392 patent"); and (3) patent infringement of United States Patent No. 6,850,464 (the "'464 patent").  For the reasons stated below, the Court grants Quantronix's Motion for Preliminary Injunction.  Also, consistent with the Court's statements and ruling made during oral argument on July 26, 2007, the Court denies Data Trak's Motion for a Stay.

## BACKGROUND

Quantronix is a corporation that develops, manufacturers, markets, and sells equipment and apparatuses for measuring, dimensioning, cubing, sizing, and weighing packages and objects.  The '015 patent (issued August 20, 1991, and entitled "Measuring Method and Apparatus"), the '392 patent (issued April 14, 1992, and entitled "Measuring

---

[1]     At oral argument, Quantronix indicated that there was no longer a need for an evidentiary hearing in order for the Court to rule on its Motion for Preliminary Injunction.  Based on that assertion, the Court denies Quantronix's request for an evidentiary hearing as moot.

Method and Apparatus"), and the '464 patent (issued February 1, 2005, and entitled "Dimensioning System and Method of Dimensioning"), all relate to measuring, dimensioning, cubing, sizing, and weighing packages and objects. Quantronix owns the '015, '392, and '464 patents by assignment. The '015 and '392 patents expire in 2009 and the '464 patent expires in 2023.

Starting in January 2007, certain package carriers such as United Parcel Service ("UPS") and Federal Express Corporation ("FedEx") changed the manner in which they charge clients for ground freight package shipments. Now, dimensional weight calculations are a requirement for most packages shipped. Both UPS and FedEx have instituted dimensional weight requirements on all ground shipping and express overnight packages. It is undisputed that these changes have increased the demand for dimensional data-acquisition systems.

In January 2007, Clark Skeen, President of Quantronix, attended a trade show in Chicago. There, Skeen observed a Data Trak dimensioning system (the "Dimmer"). Thereafter, Quantronix determined that Defendants Data Trak Technologies, Inc., Data Trak Solutions NA, Inc., and/or Michael Everson,[2] use and offer to sell and/or lease "Package Dimensioner" apparatuses, including the Dimmer, on the website www.dtsna.com/dimmer.cfm. (Compl. ¶ 17.) Quantronix also determined that

---

[2]   Everson is the Chief Executive Officer of Defendant Data Trak Solutions, NA.

3

Defendants Wildwood Technology, LLC and/or Robert Tessier[3] manufacture these apparatuses.  (*Id*. ¶ 22.)

On March 19, 2007, Quantronix learned that Johnstone Supply—a company that Quantronix had previously sold and leased package-dimensioning systems to—had declined Quantronix's offer to purchase or lease Quantronix's products.  Instead, Johnston purchased eight Dimmer dimensioning systems from Data Trak.  On March 29, 2007, and thereafter, Data Trak issued several press releases in which it offered to sell an automated dimensional data-acquisition system called the "Dimmer."[4]

On April 6, 2007, Quantronix filed the above-entitled action.[5]  Quantronix contends that Data Trak's apparatuses, and specifically the Dimmer, use ultrasonic transducers that are capable of emitting ultrasonic waves toward an object or package from multiple directions, receiving ultrasonic waves reflected from the object or package, and estimating, calculating, and/or determining the dimensions of the object or package using the reflected ultrasonic waves.  Accordingly, Quantronix asserts that the Dimmer infringes the claims of the patents-at-issue.  In addition, Quantronix asserts that Data Traks' infringing activities are eroding Quantronix's market position and undermine the strength of the patents-at-issue and Quantronix's credibility and good will.

---

[3]     Tessier is the owner of Defendant Wildwood Technology, LLC.

[4]     Quantronix learned of these press releases after it had filed suit.

[5]     On May 10, 2007, Data Trak filed a Request for *Inter Partes* Reexamination of the '464 patent with the United States Patent and Trademark Office.  There, as here, Data Trak asserts that the '464 patent is either invalid as anticipated or obvious based on United States Patent No. 6,298,009.

4

## DISCUSSION

### I.      Standard of Review

Federal Circuit law governs the issuance of preliminary injunctions in patent

cases.  "[A] preliminary injunction is a drastic and extraordinary remedy that is not to be

routinely granted."  *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir.

1993).  "A decision to grant or deny a preliminary injunction is within the sound

discretion of the district court[.]"  *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338

(Fed. Cir. 2003).  A moving party is entitled to a preliminary injunction if it can succeed

in showing the following four factors:  (1) a reasonable likelihood of success on the

merits; (2) irreparable harm if the injunction is not granted; (3) balance of harms tipping

in its favor; and (4) that the public interest is impacted favorably by an injunction.

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed. Cir.

2001).  "These factors, taken individually, are not dispositive; rather, the district court

must weigh and measure each factor against the other factors and against the form and

magnitude of the relief requested."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239

F.3d 1343, 1350 (Fed. Cir. 2001) (quotations omitted).  However, "a movant cannot be

granted a preliminary injunction unless it establishes *both* of the first two factors[.]"

*Amazon.com, Inc.*, 239 F.3d at 1350 (emphasis in original).

### II.     Analysis

Quantronix has moved for a preliminary injunction based on Data Trak's alleged

infringement of the '015, '392, and '464 patents.  For purposes of its

preliminary-injunction motion, Quantronix focuses its infringement analysis on Claim 21

of the '015 patent, Claim 6 of the '392 patent, and Claim 1 of the '464 patent.

### A.      Likelihood of Success on the Merits

"[B]ecause of the extraordinary nature of the relief, the *patentee* carries the burden

of showing likelihood of success on the merits with respect to the patent's validity,

enforceability, and infringement." *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed.

Cir. 1991) (emphasis in original).  Thus, Quantronix must demonstrate, "in light of the

presumptions and burdens that will inhere at trial on the merits, (1) it will likely prove

[infringement] and (2) its infringement claim will likely withstand [Data Trak's]

challenges to the validity and enforceability of the . . . patent[s]." *Purdue Pharma*, 237

F.3d at 1363 (quotations omitted).  In doing so, Quantronix must make a "clear showing"

that at least one claim in one valid patent-at-issue is infringed by Data Trak. *Nutrition

21*, 930 F.2d at 870; *see also Abbott Labs. v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1213

(Fed. Cir. 2007) (finding that because the district court did not err in granting a

preliminary injunction based on the '718 and '616 patents, it need not reach whether the

court erred in basing its preliminary injunction on the '407 patent).  If Data Trak raises a

"substantial question" concerning infringement, validity, or enforceability, a preliminary

injunction should not be granted.  *Amazon.com*, 239 F.3d at 1350-51.

An infringement analysis requires two steps.  First, the Court must determine the

meaning and scope of the patent claims asserted to be infringed.  *Id*. at 1351.  Second, the

Court must compare the properly construed claims to the device accused of infringing.

*Id*.  Patent claim construction, *i.e.*, the interpretation of the patent claims that define the

6

scope of the patent, is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1999). *Markman*, however, does not require a court's interpretation of claims during a preliminary injunction proceeding at an early stage in a case to be conclusive and final. *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996). "A trial court may exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art." *Id*. Therefore, claim construction findings and conclusions at the preliminary injunction stage are not binding at trial. *See Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 681 (Fed. Cir. 1990).

Proper claim construction requires an examination of the intrinsic evidence of record, including the claims of the patent language, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The terms used in the patent are presumed to carry "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006). The specification is "the single best guide to the meaning of a disputed term." *Id*. at 1315 (quotations omitted). The specification may prescribe a special definition given to a claim term, or a disavowal of claim scope by the inventor. *Id*. at 1316. In such cases, the inventor's intention that is expressed in the specification is dispositive. *Id*. The court may use a dictionary or technical treatise to "assist in understanding the commonly understood meaning" of a term, so long as any meaning found in such sources does not contradict the definition that is found in the patent

documents. *Id*. at 1322-23.  In addition, the court may not import limitations from the specification into the claims. *Id*. at 1323.

Means-plus-function limitations are interpreted according to 35 U.S.C. § 112, ¶ 6, which "allows a patentee to recite a function to be performed as a claim limitation rather than reciting structure or materials for performing that function." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003).  The court's construction of a means-plus-function limitation follows a two-step approach. *Id.*  First, the court "must identify the claimed function, . . . staying true to the claim language and the limitations expressly recited by the claims." *Id.* (citation omitted).  Once these functions are identified, the court must "ascertain the corresponding structures in the written description that perform those functions." *Id.*  "A disclosed structure is corresponding 'only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.'" *Id.* (quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).  "[T]he structure must be necessary to perform the claimed function." *Id*.  Whether certain claim language invokes 35 U.S.C. § 112, ¶ 6, is a question of law. *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 702 (Fed. Cir. 1998).

The Court presumes that an applicant's use of the term "means" in a claim limitation was intended to convey a means-plus-function limitation under § 112, ¶ 6. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997).  But this presumption is rebuttable if the properly construed claim limitation itself recites sufficiently definite structure to perform the claimed function. *Id.* at 1427-28.  In

determining whether a claim term limitation recites sufficient structure, the court inquires into whether the "term, as a name for structure, has a reasonably well understood meaning in the art." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880-81 (Fed. Cir. 2000) (quotations omitted).

Quantronix asserts that Data Trak's Dimmer meets all of the limitations of Claim 21. Initially, Quantronix offered several claim elements for construction. For the purposes of this motion, Data Trak, however, only contests infringement on the ground that the Dimmer does not meet the "trigger means" limitation. Data Trak does not contest Quantronix's proposed claim constructions and specifically does not contest Quantronix's proposed claim construction for the "trigger means" limitation.

Claim 21 of the '015 patent reads as follows:

21. An apparatus for measuring an object, comprising:
two ultrasonic transducer means, each having an emitter and a receiver associated therewith and oriented in substantially mutually perpendicular relationship to define a two-dimensional field of greater extent in each dimension than that of the largest object to be measured, said ultrasonic transducer means each being aimed across said field to measure a mutually perpendicular dimension of said object;
a third ultrasonic transducer means having an emitter and a receiver associated therewith for measuring a third dimension of said object in a direction substantially mutually perpendicular to said first two measured dimensions;
trigger means for selectively activating each of said transducer means to take a dimensional measurement when said object is in proximity thereto;
timer means for determining travel time between the generation of an ultrasonic wave by each emitter and the receipt of said wave by its associated receiver after reflection from said object;
correlation means for correlating said travel times to linear distances;
computing means for determining the dimensions of said object from said linear distances; and
data collection means for collecting said dimensional measurements.

('015 patent, col. 14, l. 61 – col. 15, l. 21.)

Here, the "trigger means" claim element does not recite sufficient structure to

perform the undisputed function of selectively activating, and Data Trak does not dispute

and has not presented evidence to overcome the presumption that this is a

means-plus-function limitation.  As to the corresponding structure disclosed in the

specification for carrying out the function, Quantronix contends that "trigger means for

selectively activating each of said transducer means to take a dimensional measurement

when said object is in proximity thereto" should be construed to comprise either a beam,

a sensor, a timer, a footswitch, a software command or equivalents thereof.  Quantronix

points to the '015 patent specification, which provides in part as follows:

> Given that orientation of movement, photocell 22 and retroreflector 24 are
> preferably mounted substantially in lateral alignment with sensors 14 and
> 16 so as to trigger a measurement when the leading edge of a large object
> 28 or a small object 26 interrupts the light beam between photocell 22 and
> reflector 24.  Photocell 22 may be any commercially available photocell,
> preferably operating in the infrared polarized light range.  Proximity
> sensors of various types, including but not limited to magnetic or
> capacitive, may also be employed.

('015 patent, col. 4, ll. 9-19.)  Quantronix also points to the following portion of the

specification:

> Sensor 12 is triggered by the interruption by an object of the beam 23
> between photocell 22 and retroreflector 24 (FIG. 5) in the instance of unit
> 10, and by the operator in the case of unit 110.  Process controller 180, in
> response to photocell 22, produces a trigger signal, sent to pulser 202 and
> counter/timer 204, causing pulser 202 to transmit an activation signal to
> sensor 12 and counter/timer 204 to start counting.  If static measurement
> unit 110 is being controlled, pulser activation may be triggered by a timer,
> footswitch, software command or other suitable means via unit 180.  The

> pulser signal causes sensor 12 to transmit an ultrasonic signal burst toward
> the object to be measured.

('015 patent, col. 9, ll. 27-40.)  In addition, Quantronix cites to the following portion of

the Summary of the Invention:

> [T]he measuring . . . operations may be triggered and data accumulated and
> processed by computer means; bar code or other optical character
> recognition via an optical character recognition reader decodes
> identification of the objects measured to automatically correlate
> measurements to a specific package[.]

('015 patent, col. 2, l. 67 – col. 3, l. 5.)  Again, Data Trak does not dispute Quantronix's

construction.

Although neither party entered the '015 patent's prosecution history as evidence

for this motion, the parties represented at oral argument that there is nothing in the

prosecution history that would assist the Court in claim construction and that the Court

had everything that it would need in front of it to make a determination for the purposes

of this motion.[6]  Relying on the parties' representations, and upon thorough consideration

of the available intrinsic evidence, the Court agrees with Quantronix and construes

"trigger means," for the purposes of this motion, to comprise either a beam, a sensor, a

timer, a footswitch, a software command or equivalents thereof.

---

[6]      In addition, neither party entered the '392 patent's prosecution history as evidence
for this motion either.  And the parties similarly represented at oral argument that there is
nothing in the prosecution history that would assist the Court for the purposes of ruling
on the present motion.

Based on this construction, Quantronix contends that the Dimmer infringes Claim 21 of the '015 patent.  Specifically, Quantronix asserts that the "trigger means" limitation reads on the Dimmer as follows:

> The Dimmer inherently includes a device or mechanism used to selectively trigger each of the ultrasonic transducers (2), (3), and (4) to take a dimensional measurement of the object (6) when the object (6) is placed on the surface (1) in proximity to the ultrasonic transducers (2), (3), and (4). (Kennington Declaration, ¶ 25; Schafer Declaration, ¶ 21).  A software command can be used to selectively trigger each of the ultrasonic transducers (2), (3), and (4) to take a dimensional measurement when an object (6) is in proximity to the transducers (2), (3), and (4).  (Id.). Therefore, at least the software command comprises trigger means for selectively activating each of the ultrasonic transducers (2), (3), and (4) to take a dimensional measurement when an object (6) is in proximity to the transducers (2), (3), and (4), although it is very likely that the ultrasonic transducers (2), (3), and (4) can be triggered by other trigger means. (Kennnington Declaration, ¶¶ 26, 28, and 29).

(Decl. of H. Dickson Burton in Supp. of Pl.'s Mot. for Prelim. Inj. and Req. for Evidentiary Hr'g, Ex. A at 2-3.)

Data Trak disagrees, asserting that the Dimmer does not have "selective triggering means."[7]  Specifically, Data Trak asserts that the front transducer on the Dimmer is not selectively fired.  Instead, Data Trak asserts that the front transducer is "free firing," firing several times each second to take a dimensional measurement regardless of whether an object has been placed in proximity to the transducer.  When an object is not in proximity to the front transducer, Data Trak explains that the Dimmer's control system simply ignores the dimensional measurements taken.  Data Trak further explains that

---

[7]     Data Trak does not assert invalidity or unenforceability against Claim 21.

12

when the measurement changes (i.e., when an object is present), the control system

detects the dimensional change from the front transducer, and then the remaining

transducers are sequentially fired to take a dimensional measurement.  It is then, Data

Trak asserts, that the Dimmer records the dimensional measurements taken from each of

the transducers.[8]

Quantronix responds, asserting that the trigger means of the Dimmer comprises

the control system (i.e., the control box), and that the control system activates the front

transducer to detect the presence of an object when an object is placed on the platform of

the Dimmer.  Therefore, Quantronix contends that even though the front transducer may

be firing several times a second, the trigger means still activates the front transducer to

take a dimensional measurement only when the trigger means detects the presence of an

object.  Quantronix therefore asserts that Data Trak neglects the claim language that

requires that a "dimensional measurement" be a dimensional measurement of the object

being measured.

The Court agrees with Quantronix to the extent that it finds that there is evidence

in the record showing that the Dimmer meets all elements of Claim 21.  Defendant

Robert R. Tessier, the founder and sole owner of Defendant Wildwood Technology,

---

[8]     Data Trak contends that the free-firing nature of the front transducer cannot be
ascertained by reviewing the materials in the record; rather, Data Trak contends that such
an inquiry would require an inspection of the Dimmer.  Therefore, Data Trak requests
that the Court exclude the Declarations of Robert L. Kennington, Clark Skeen, and
Mark E. Schafer for lack of foundation because they did not personally examine the
Dimmer.  The Court declines Data Trak's request.  As shown below, the Court's decision
is not based on any of these three declarations.  Moreover, Data Trak's objection goes to
the weight to be given to the statements, not their admissibility.

LLC, who is responsible for the design and manufacture of the Dimmer, states in his declaration that "the control box contains a single Senix USWJ232-PCB circuit board for *controlling the firing of the transducers (including the Front Transducer)* and this circuit board provides for free-firing of the controlled transducer."  (Decl. of Robert R. Tessier in Supp. of Defs.' Mem. in Opp'n to Pl.'s Mot for a Prelim. Inj. ("Tessier Decl.") at ¶ 23 (emphasis added).)  The User's Guide for the Senix Utrasonic Sensor USWJ232 circuit board confirms that the transducer is connected to the circuit board through the use of a cable.  (Tessier Decl., Ex. A at 6.)  Because the control box contains a circuit board that is connected to the transducer, it is likely that the control box has the means for firing the transducers.  Further, even though the front transducer may be continuously firing, or "free-firing," the firing is controlled by the control system in the control box; it cannot "fire" without the connection to the control box.  The fact that the Dimmer's transducers can be controlled by the control system, and the fact that the Dimmer reacts differently when there is an object in proximity to the front transducer, which results in the recording of the response from each transducer for the purpose of taking a dimensional measurement, supports the Court's conclusion that the Dimmer contains "trigger means for selectively activating each of said transducer means to take a dimensional measurement when said object is in proximity thereto," which in turn supports Quantronix's infringement assertion.  The Court therefore finds that Quantronix has met its burden by establishing a likelihood of succeeding on the merits of Claim 21 of the '015 patent.

Because Quantronix has shown a likelihood of success on the merits of its patent infringement claim as to Claim 21 of the '015 patent, the Court grants its Motion for Preliminary Injunction.  As a result, the Court need not reach the questions of whether Data Trak infringes Claim 6 of the '392 patent or whether the '464 patent is invalid at this preliminary injunction stage of the proceedings.  Even so, the Court notes that given that there are "substantial open issues and questions that must be litigated before a finding of infringement [or invalidity] can be made, including [questions regarding] claim construction," *Cargo Protectors, Inc. v. Am. Lock Co.*, 92 F. Supp. 2d 926, 930 (D. Minn. 2000) (quotations omitted), the Court would deny a preliminary injunction at this time based on the alleged infringement of the '392 or '464 patents.

### B.      Irreparable Harm

"Irreparable harm is presumed when a clear showing of patent validity and infringement has been made . . . .  This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm." *Amazon.com, Inc.*, 239 F.3d at 1350 (citations and quotations omitted).

Aside from any presumption, Quantronix primarily asserts that it will be irreparably harmed because Data Trak's infringement will destroy Quantronix's market share.  Specifically, Quantronix contends that because there is currently a unique opportunity for rapid growth in sales of dimensional data-acquisition systems, if Data Trak is not immediately enjoined from selling dimensional data-acquisition systems (i.e., the Dimmer), Quantronix's market position will erode further, causing extreme

15

difficulty to recover.  In addition, Quantronix contends that Data Traks' dimensional

data acquisition systems are of inferior quality to Quantronix's systems, and therefore,

Data Trak's sales may likely cause customers to be disinclined to buy any dimensional

data-acquisition systems in the future, which would further injure Quantronix.

Quantronix contends that the above-described damage cannot be adequately remedied

with monetary damages.  Data Trak does not respond to Quantronix's assertion that

Quantronix will be irreparably harmed absent a preliminary injunction.

The Court finds that Quantronix has shown irreparable injury based on continued

infringement, Quantronix's loss of profits and the resulting loss of business opportunity

and market share, the unique opportunity for rapid growth in sales of Quantronix's

patented products, and the fact that the '015 patent will expire in approximately two

years.

### C.    Balance of Harms and Public Interest

Because Quantronix has demonstrated both a likelihood of success on the merits

as to Claim 21 of the '015 patent and irreparable harm and because Data Trak does not

raise any prejudice that it may have if a preliminary injunction is granted, nor responds to

Quantronix's assertion that the balance-of-harms factor weighs in Quantronix's favor, the

Court finds that the balance of the harms weighs in favor of Quantronix.  In addition,

because Quantronix has demonstrated that it is likely that Data Trak infringed or violated

its rights and because Data Trak does not respond to Quantronix's assertion that the

public interest factor weighs in Quantronix's favor, the Court finds that the public interest

here favors the protection of patent rights and favors granting a preliminary injunction.

16

# ORDER

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Quantronix's Motion for Preliminary Injunction (Doc. No. 13) is

**GRANTED**.  Defendants, their officers, agents, servants, employees, attorneys, parents,

subsidiaries and related companies, and all persons acting for, with, by, through or under

them having notice of this Order by personal service, electronic mail, or otherwise, and

each of them, shall be preliminarily enjoined and restrained during the pendency of this

action, from:

        a.      either directly or indirectly, or in any way, manufacturing,

using, importing, selling, offering for sale, leasing, and/or offering for

lease the Dimmer product,[9] or any other data-acquisition system or

dimensioning system product as claimed in United States Patent

No. 5,042,015.[10]

---

[9]      For the purposes of this preliminary injunction, and until further hearing on the
issue or order of the Court, the "Dimmer product" includes tables, scales, printers, CPUs
and other like components sold as part of the Dimmer system or sold to be used with the
Dimmer.  At this point, Defendants do not dispute that all such components operate
together with the rest of the Dimmer.  Also, although Defendants assert that these other
components are not "required" component parts of the patented invention, in light of the
Court's finding that Quantronix has shown a likelihood of success on the merits of its
patent infringement claim as to Claim 21 of the '015 patent, and in light of the fact that
Defendants have not shown that these other components have no functional relationship
with the Dimmer, the Court finds it appropriate to include these components as part of the
"Dimmer product" at this time.

[10]      Although the Court is allowing Defendants to repair, perform maintenance on,
and/or sell replacement parts for Dimmer products sold prior to August 1, 2007, as
explained below, the Court notes that it would have the right to preclude Defendants from

(Footnote Continued on Next Page)

i.      Defendants are prohibited from repairing, performing

maintenance on, and/or selling replacement parts for any Dimmer

products sold on or after August 13, 2007.

ii.      Defendants are allowed to repair, perform

maintenance on, and/or sell replacement parts for Dimmer products

sold prior to August 13, 2007, but Defendants are prohibited from

replacing any previously sold entire Dimmer product with another

entire Dimmer product.

iii.      Defendants shall provide notice to Quantronix,

through counsel, within seven days of the completion of repairing,

performing maintenance on, and/or selling replacement parts for any

Dimmer product.  Said notice shall include a detailed description of

the repair, maintenance, service, or replacement part, including the

cost to be charged to the customer, and provision of any

documentation such as a repair order or purchase order.

---

(Footnote Continued From Previous Page)
doing so.  The Court chooses to take the less restrictive approach only because
Quantronix is secured a remedy in damages later and potential damages incurred by
Quantronix can be reasonably calculated with substantial accuracy with proper
documentation.  The Court reminds Defendants that when interpreting this Order, to
remember that this is a patent case.  Although the Court does not specifically state that
Defendants are enjoined from "infringing, inducing infringement, or contributing to the
infringement of the patent-at-issue" at this time, the Court warns the Defendants that in
choosing to partake in activities that fall within those categories, the Defendants run the
risk of substantiating a willfulness claim against them if they lose this litigation battle.

iv.      Defendants shall provide to Quantronix a monthly accounting report detailing all activities involving the repair, performance of maintenance on, and/or sales of replacement parts for Dimmer products performed during that calendar month.  The monthly accounting report shall include sufficient detail to allow the determination of the Defendants' gross revenues and gross profits associated with such activities, and shall be due to Quantronix on or before the last day of the next subsequent calendar month.  Said report shall also include any purchase orders, service orders, or invoices not previously provided.

v.      Upon receiving such notice and/or accounting report as described above in paragraphs iii and iv, Quantronix may approach the Court if it believes Defendants (1) are partaking in activities outside the scope of this Order; (2) have provided Quantronix with insufficient detail regarding the notice and/or accounting report; or (3) are partaking in activities that were not contemplated prior to the Court issuing this Order.

b.      Specifically, this Preliminary Injunction shall include within its scope any package dimensioning system or apparatus, comprising:

two ultrasonic transducer means, each having an emitter and a
receiver associated therewith and oriented in substantially
mutually perpendicular relationship to define a two-
dimensional field of greater extent in each dimension than
that of the largest object to be measured, said ultrasonic

transducer means each being aimed across said field to measure a mutually perpendicular dimension of said object;

a third ultrasonic transducer means having an emitter and a receiver associated therewith for measuring a third dimension of said object in a direction substantially mutually perpendicular to said first two measured dimensions;

trigger means for selectively activating each of said transducer means to take a dimensional measurement when said object is in proximity thereto;

timer means for determining travel time between the generation of an ultrasonic wave by each emitter and the receipt of said wave by its associated receiver after reflection from said object;

correlation means for correlating said travel times to linear distances;

computing means for determining the dimensions of said object from said linear distances; and

data collection means for collecting said dimensional measurements.

('015 patent, col. 14, l. 61- col. 15, l. 21.)

    c.    The Preliminary Injunction is hereby stayed until Monday, August 13, 2007, at noon.  At that time, absent an agreement otherwise by the parties, the Preliminary Injunction shall be in full force and effect.

    2.    Data Trak's Motion for a Stay of Litigation on the '464 Patent Pending Completion of Reexamination of the '464 Patent (Doc. No. 44) is **DENIED**.


Dated:  January 30, 2008                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court